# Exhibit D

S-1 1 ds1.htm FORM S-1

Table of Contents

As filed with the Securities and Exchange Commission on April 29, 2004

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM S-1
## REGISTRATION STATEMENT
Under

*The Securities Act of 1933*

## GOOGLE INC.
(Exact name of Registrant as specified in its charter)

| Delaware | 7375 | 77-0493581 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

1600 Amphitheatre Parkway
Mountain View, CA 94043
(650) 623-4000

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

Eric Schmidt
Chief Executive Officer
Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043
(650) 623-4000

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| Larry W. Sonsini, Esq. | David C. Drummond, Esq. | William H. Hinman, Jr., Esq. |
|---|---|---|
| David J. Segre, Esq. | Jeffery L. Donovan, Esq. | Simpson Thacher & Bartlett LLP |
| Wilson Sonsini Goodrich & Rosati, P.C. | Anna Itoi, Esq. | 3330 Hillview Avenue |
| 650 Page Mill Road | Google Inc. | Palo Alto, California 94304 |
| Palo Alto, California 94304-1050 | 1600 Amphitheatre Parkway | (650) 251-5000 |
| (650) 493-9300 | Mountain View, CA 94043 | |
| | (650) 623-4000 | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are being offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended (the "Securities Act"), check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. ☐

## CALCULATION OF REGISTRATION FEE

Proposed Maximum

[Pages Intentionally Omitted]

Table of Contents

# LETTER FROM THE FOUNDERS
## "AN OWNER'S MANUAL" FOR GOOGLE'S SHAREHOLDERS[1]

INTRODUCTION

Google is not a conventional company. We do not intend to become one. Throughout Google's evolution as a privately held company, we have managed Google differently. We have also emphasized an atmosphere of creativity and challenge, which has helped us provide unbiased, accurate and free access to information for those who rely on us around the world.

Now the time has come for the company to move to public ownership. This change will bring important benefits for our employees, for our present and future shareholders, for our customers, and most of all for Google users. But the standard structure of public ownership may jeopardize the independence and focused objectivity that have been most important in Google's past success and that we consider most fundamental for its future. Therefore, we have designed a corporate structure that will protect Google's ability to innovate and retain its most distinctive characteristics. We are confident that, in the long run, this will bring Google and its shareholders, old and new, the greatest economic returns. We want to clearly explain our plans and the reasoning and values behind them. We are delighted you are considering an investment in Google and are reading this letter.

Sergey and I intend to write you a letter like this one every year in our annual report. We'll take turns writing the letter so you'll hear directly from each of us. We ask that you read this letter in conjunction with the rest of this prospectus.

SERVING END USERS

Sergey and I founded Google because we believed we could provide a great service to the world—instantly delivering relevant information on any topic. Serving our end users is at the heart of what we do and remains our number one priority.

Our goal is to develop services that improve the lives of as many people as possible—to do things that matter. We make our services as widely available as we can by supporting over 97 languages and by providing most services for free. Advertising is our principal source of revenue, and the ads we provide are relevant and useful rather than intrusive and annoying. We strive to provide users with great commercial information.

We are proud of the products we have built, and we hope that those we create in the future will have an even greater positive impact on the world.

LONG TERM FOCUS

*As a private company, we have concentrated on the long term, and this has served us well. As a public company, we will do the same. In our opinion, outside pressures too often tempt companies to sacrifice long-term opportunities to meet quarterly market expectations. Sometimes this pressure has caused companies to manipulate financial results in order to "make their quarter." In Warren Buffett's words, "We won't 'smooth' quarterly or annual results: If earnings figures are lumpy when they reach headquarters, they will be lumpy when they reach you."*

If opportunities arise that might cause us to sacrifice short term results but are in the best long term interest of our shareholders, *we will take those opportunities*. We will have the fortitude to do this. We would request that our shareholders take the long term view.

Many companies are under pressure to keep their earnings in line with analysts' forecasts. Therefore, they often accept smaller, but predictable, earnings rather than larger and more unpredictable returns. Sergey and I feel this is harmful, and we intend to steer in the opposite direction.

---

[1] Much of this was inspired by Warren Buffett's essays in his annual reports and his "An Owner's Manual" to Berkshire Hathaway shareholders.

i

Table of Contents

Google has had adequate cash to fund our business and has generated additional cash through operations. This gives us the flexibility to weather costs, benefit from opportunities and optimize our long term earnings. For example, in our ads system we make many improvements that affect revenue in both directions. These are in areas like end user relevance and satisfaction, advertiser satisfaction, partner needs and targeting technology. We release improvements immediately rather than delaying them, even though delay might give "smoother" financial results. You have our commitment to execute quickly to achieve long term value rather than making the quarters more predictable.

We will make decisions on the business fundamentals, not accounting considerations, and always with the long term welfare of our company and shareholders in mind.

Although we may discuss long term trends in our business, we do not plan to give earnings guidance in the traditional sense. We are not able to predict our business within a narrow range for each quarter. We recognize that our duty is to advance our shareholders' interests, and we believe that artificially creating short term target numbers serves our shareholders poorly. We would prefer not to be asked to make such predictions, and if asked we will respectfully decline. A management team distracted by a series of short term targets is as pointless as a dieter stepping on a scale every half hour.

RISK VS REWARD IN THE LONG RUN

*Our business environment changes rapidly and needs long term investment. We will not hesitate to place major bets on promising new opportunities.*

We will not shy away from high-risk, high-reward projects because of short term earnings pressure. Some of our past bets have gone extraordinarily well, and others have not. Because we recognize the pursuit of such projects as the key to our long term success, we will continue to seek them out. For example, we would fund projects that have a 10% chance of earning a billion dollars over the long term. Do not be surprised if we place smaller bets in areas that seem very speculative or even strange. As the ratio of reward to risk increases, we will accept projects further outside our normal areas, especially when the initial investment is small.

We encourage our employees, in addition to their regular projects, to spend 20% of their time working on what they think will most benefit Google. This empowers them to be more creative and innovative. Many of our significant advances have happened in this manner. For example, AdSense for content and Google News were both prototyped in "20% time." Most risky projects fizzle, often teaching us something. Others succeed and become attractive businesses.

We may have quarter-to-quarter volatility as we realize losses on some new projects and gains on others. If we accept this, we can all maximize value in the long term. Even though we are excited about risky projects, we expect to devote the vast majority of our resources to our main businesses, especially since most people naturally gravitate toward incremental improvements.

EXECUTIVE ROLES

*We run Google as a triumvirate. Sergey and I have worked closely together for the last eight years, five at Google. Eric, our CEO, joined Google three years ago. The three of us run the company collaboratively with Sergey and me as Presidents. The structure is unconventional, but we have worked successfully in this way.*

To facilitate timely decisions, Eric, Sergey and I meet daily to update each other on the business and to focus our collaborative thinking on the most important and immediate issues. Decisions are often made by one of us, with the others being briefed later. This works because we have tremendous trust and respect for each other and we generally think alike. Because of our intense long term working relationship, we can often predict differences of opinion among the three of us. We know that when we disagree, the correct decision is far from obvious. For important decisions, we discuss the issue with the larger team. Eric, Sergey and I run the company without any significant internal conflict, but with healthy debate. As different topics come up, we often delegate decision-making responsibility to one of us.

ii

Table of Contents

We hired Eric as a more experienced complement to Sergey and me to help us run the business. Eric was CTO of Sun Microsystems. He was also CEO of Novell and has a Ph.D. in computer science, a very unusual and important combination for Google given our scientific and technical culture. This partnership among the three of us has worked very well and we expect it to continue. The shared judgments and extra energy available from all three of us has significantly benefited Google.

Eric has the legal responsibilities of the CEO and focuses on management of our vice presidents and the sales organization. Sergey focuses on engineering and business deals. I focus on engineering and product management. All three of us devote considerable time to overall management of the company and other fluctuating needs. We are extremely fortunate to have talented management that has grown the company to where it is today—they operate the company and deserve the credit.

CORPORATE STRUCTURE

*We are creating a corporate structure that is designed for stability over long time horizons. By investing in Google, you are placing an unusual long-term bet on the team, especially Sergey and me, and on our innovative approach.*

We want Google to become an important and significant institution. That takes time, stability and independence. We bridge the media and technology industries, both of which have experienced considerable consolidation and attempted hostile takeovers.

In the transition to public ownership, we have set up a corporate structure that will make it harder for outside parties to take over or influence Google. This structure will also make it easier for our management team to follow the long term, innovative approach emphasized earlier. This structure, called a dual class voting structure, is described elsewhere in this prospectus.

The main effect of this structure is likely to leave our team, especially Sergey and me, with significant control over the company's decisions and fate, as Google shares change hands. New investors will fully share in Google's long term growth but will have less influence over its strategic decisions than they would at most public companies.

While this structure is unusual for technology companies, it is common in the media business and has had a profound importance there. The New York Times Company, the Washington Post Company and Dow Jones, the publisher of *The Wall Street Journal*, all have similar dual class ownership structures. Media observers frequently point out that dual class ownership has allowed these companies to concentrate on their core, long-term interest in serious news coverage, despite fluctuations in quarterly results. The Berkshire Hathaway company has applied the same structure, with similar beneficial effects. From the point of view of long-term success in advancing a company's core values, the structure has clearly been an advantage.

Academic studies have shown that from a purely economic point of view, dual class structures have not harmed the share price of companies. The shares of each of our classes have identical economic rights and differ only as to voting rights.

Google has prospered as a private company. As a public company, we believe a dual class voting structure will enable us to retain many of the positive aspects of being private. We understand some investors do not favor dual class structures. We have considered this point of view carefully, and we have not made our decision lightly. We are convinced that everyone associated with Google—including new investors—will benefit from this structure.

To help us govern, we have recently expanded our Board of Directors to include three additional members. John Hennessy is the President of Stanford and has a Doctoral degree in computer science. Art Levinson is CEO of Genentech and has a Ph.D. in biochemistry. Paul Otellini is President and COO of Intel. We could not be more excited about the caliber and experience of these directors.

iii

Table of Contents

We have a world class management team impassioned by Google's mission and responsible for Google's success. We believe the stability afforded by the dual-class structure will enable us to retain our unique culture and continue to attract and retain talented people who are Google's life blood. Our colleagues will be able to trust that they themselves and their labors of hard work, love and creativity will be well cared for by a company focused on stability and the long term.

As an investor, you are placing a potentially risky long term bet on the team, especially Sergey and me. The two of us, Eric and the rest of the management team recognize that our individual and collective interests are deeply aligned with those of the new investors who choose to support Google. Sergey and I are committed to Google for the long term. The broader Google team has also demonstrated an extraordinary commitment to our long term success. With continued hard work and good fortune, this commitment will last and flourish.

When Sergey and I founded Google, we hoped, but did not expect, it would reach its current size and influence. Our intense and enduring interest was to objectively help people find information efficiently. We also believed that searching and organizing all the world's information was an unusually important task that should be carried out by a company that is trustworthy and interested in the public good. We believe a well functioning society should have abundant, free and unbiased access to high quality information. Google therefore has a responsibility to the world. The dual-class structure helps ensure that this responsibility is met. We believe that fulfilling this responsibility will deliver increased value to our shareholders.

BECOMING A PUBLIC COMPANY

*Google should go public soon.*

We assumed when founding Google that if things went well, we would likely go public some day. But we were always open to staying private, and a number of developments reduced the pressure to change. We soon were generating cash, removing one important reason why many companies go public. Requirements for public companies became more significant in the wake of recent corporate scandals and the resulting passage of the Sarbanes-Oxley Act. We made business progress we were happy with. Our investors were patient and willing to stay with Google. We have been able to meet our business needs with our current level of cash.

A number of factors weighed on the other side of the debate. Our growth has reduced some of the advantages of private ownership. By law, certain private companies must report as if they were public companies. The deadline imposed by this requirement accelerated our decision. As a smaller private company, Google kept business information closely held, and we believe this helped us against competitors. But, as we grow larger, information becomes more widely known. As a public company, we will of course provide you with all information required by law, and we will also do our best to explain our actions. But we will not unnecessarily disclose all of our strengths, strategies and intentions. We have transferred significant ownership of Google to employees in return for their efforts in building the business. And, we benefited greatly by selling $26 million of stock to our early investors before we were profitable. Thus, employee and investor liquidity were significant factors.

We have demonstrated a proven business model and have designed a corporate structure that will make it easier to become a public company. A large, diverse, enthusiastic shareholder base will strengthen the company and benefit from our continued success. A larger cash balance will provide Google with flexibility and protection against adversity. All in all, going public now is the right decision.

IPO PRICING AND ALLOCATION

*Informed investors willing to pay the IPO price should be able to buy as many shares as they want, within reason, in the IPO, as on the stock market.*

*It is important to us to have a fair process for our IPO that is inclusive of both small and large investors. It is also crucial that we achieve a good outcome for Google and its current shareholders. This has led us to pursue*

iv

Table of Contents

*an auction-based IPO for our entire offering. Our goal is to have a share price that reflects a fair market valuation of Google and that moves rationally based on changes in our business and the stock market.* (The auction process is discussed in more detail elsewhere in this prospectus.)

Many companies have suffered from unreasonable speculation, small initial share float, and boom-bust cycles that hurt them and their investors in the long run. We believe that an auction-based IPO will minimize these problems.

An auction is an unusual process for an IPO in the United States. Our experience with auction-based advertising systems has been surprisingly helpful in the auction design process for the IPO. As in the stock market, if people try to buy more stock than is available, the price will go up. And of course, the price will go down if there aren't enough buyers. This is a simplification, but it captures the basic issues. Our goal is to have an efficient market price—a rational price set by informed buyers and sellers—for our shares at the IPO and afterward. Our goal is to achieve a relatively stable price in the days following the IPO and that buyers and sellers receive a fair price at the IPO.

We are working to create a sufficient supply of shares to meet investor demand at IPO time and after. We are encouraging current shareholders to consider selling some of their shares as part of the offering. These shares will supplement the shares the company sells to provide more supply for investors and hopefully provide a more stable fair price. Sergey and I, among others, are currently planning to sell a fraction of our shares in the IPO. The more shares current shareholders sell, the more likely it is that they believe the price is not unfairly low. The supply of shares available will likely have an effect on the clearing price of the auction. Since the number of shares being sold is likely to be larger at a high price and smaller at a lower price, investors will likely want to consider the scope of current shareholder participation in the IPO. We may communicate from time to time that we would be sellers rather than buyers.

*We would like you to invest for the long term, and to do so only at or below what you determine to be a fair price. We encourage investors not to invest in Google at IPO or for some time after, if they believe the price is not sustainable over the long term.*

We intend to take steps to help ensure shareholders are well informed. We encourage you to read this prospectus. We think that short term speculation without paying attention to price is likely to lose you money, especially with our auction structure.

GOOGLERS

*Our employees, who have named themselves Googlers, are everything. Google is organized around the ability to attract and leverage the talent of exceptional technologists and business people. We have been lucky to recruit many creative, principled and hard working stars. We hope to recruit many more in the future. We will reward and treat them well.*

We provide many unusual benefits for our employees, including meals free of charge, doctors and washing machines. We are careful to consider the long term advantages to the company of these benefits. Expect us to add benefits rather than pare them down over time. We believe it is easy to be penny wise and pound foolish with respect to benefits that can save employees considerable time and improve their health and productivity.

The significant employee ownership of Google has made us what we are today. Because of our employee talent, Google is doing exciting work in nearly every area of computer science. We are in a very competitive industry where the quality of our product is paramount. Talented people are attracted to Google because we empower them to change the world; Google has large computational resources and distribution that enables individuals to make a difference. Our main benefit is a workplace with important projects, where employees can contribute and grow. We are focused on providing an environment where talented, hard working people are rewarded for their contributions to Google and for making the world a better place.

Table of Contents

## DON'T BE EVIL

*Don't be evil. We believe strongly that in the long term, we will be better served—as shareholders and in all other ways—by a company that does good things for the world even if we forgo some short term gains. This is an important aspect of our culture and is broadly shared within the company.*

Google users trust our systems to help them with important decisions: medical, financial and many others. Our search results are the best we know how to produce. They are unbiased and objective, and we do not accept payment for them or for inclusion or more frequent updating. We also display advertising, which we work hard to make relevant, and we label it clearly. This is similar to a newspaper, where the advertisements are clear and the articles are not influenced by the advertisers' payments. We believe it is important for everyone to have access to the best information and research, not only to the information people pay for you to see.

## MAKING THE WORLD A BETTER PLACE

We aspire to make Google an institution that makes the world a better place. With our products, Google connects people and information all around the world for free. We are adding other powerful services such as Gmail that provides an efficient one gigabyte Gmail account for free. By releasing services for free, we hope to help bridge the digital divide. AdWords connects users and advertisers efficiently, helping both. AdSense helps fund a huge variety of online web sites and enables authors who could not otherwise publish. Last year we created Google Grants—a growing program in which hundreds of non-profits addressing issues, including the environment, poverty and human rights, receive free advertising. And now, we are in the process of establishing the Google Foundation. We intend to contribute significant resources to the foundation, including employee time and approximately 1% of Google's equity and profits in some form. We hope someday this institution may eclipse Google itself in terms of overall world impact by ambitiously applying innovation and significant resources to the largest of the world's problems.

## SUMMARY AND CONCLUSION

Google is not a conventional company. Eric, Sergey and I intend to operate Google differently, applying the values it has developed as a private company to its future as a public company. Our mission and business description are available in the rest of the prospectus; we encourage you to carefully read this information. We will optimize for the long term rather than trying to produce smooth earnings for each quarter. We will support selected high-risk, high-reward projects and manage our portfolio of projects. We will run the company collaboratively with Eric, our CEO, as a team of three. We are conscious of our duty as fiduciaries for our shareholders, and we will fulfill those responsibilities. We will continue to attract creative, committed new employees, and we will welcome support from new shareholders. We will live up to our "don't be evil" principle by keeping user trust and not accepting payment for search results. We have a dual-class structure that is biased toward stability and independence and that requires investors to bet on the team, especially Sergey and me.

In this letter we have explained our thinking on why Google is better off going public. We have talked about our IPO auction method and our desire for stability and access for all investors. We have discussed our goal to have investors who determine a rational price and invest for the long term only if they can buy at that price. Finally, we have discussed our desire to create an ideal working environment that will ultimately drive the success of Google by retaining and attracting talented Googlers.

We have tried hard to anticipate your questions. It will be difficult for us to respond to them given legal constraints during our offering process. We look forward to a long and hopefully prosperous relationship with you, our new investors. We wrote this letter to help you understand our company.

vi

Table of Contents

We have a strong commitment to our users worldwide, their communities, the web sites in our network, our advertisers, our investors, and of course our employees. Sergey and I, and the team will do our best to make Google a long term success and the world a better place.

*Larry Page*        *Sergey Brin*

Larry Page        Sergey Brin

vii

[Pages Intentionally Omitted]

Table of Contents

We also face risks associated with our trademarks. For example, there is a risk that the word "Google" could become so commonly used that it becomes synonymous with the word "search." If this happens, we could lose protection for this trademark, which could result in other people using the word "Google" to refer to their own products, thus diminishing our brand.

We also seek to maintain certain intellectual property as trade secrets. The secrecy could be compromised by third parties, or intentionally or accidentally by our employees, which would cause us to lose the competitive advantage resulting from these trade secrets.

***We are, and may in the future be, subject to intellectual property rights claims, which are costly to defend, could require us to pay damages and could limit our ability to use certain technologies in the future.***

Companies in the Internet, technology and media industries own large numbers of patents, copyrights, trademarks and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. As we face increasing competition, the possibility of intellectual property rights claims against us grows. Our technologies may not be able to withstand any third-party claims or rights against their use. Any intellectual property claims, with or without merit, could be time-consuming, expensive to litigate or settle and could divert management resources and attention. In addition, many of our agreements with members of our Google Network require us to indemnify these members for third-party intellectual property infringement claims, which would increase our costs as a result of defending such claims and may require that we pay damages if there were an adverse ruling in any such claims. An adverse determination also could prevent us from offering our products and services to others and may require that we procure substitute products or services for these members.

With respect to any intellectual property rights claim, we may have to pay damages or stop using technology found to be in violation of a third party's rights. We may have to seek a license for the technology, which may not be available on reasonable terms and may significantly increase our operating expenses. The technology also may not be available for license to us at all. As a result, we may also be required to develop alternative non-infringing technology, which could require significant effort and expense. If we cannot license or develop technology for the infringing aspects of our business, we may be forced to limit our product and service offerings and may be unable to compete effectively. Any of these results could harm our brand and operating results.

From time to time, we receive notice letters from patent holders alleging that certain of our products and services infringe their patent rights. Some of these have resulted in litigation against us. For example, Overture Services (now owned by Yahoo) has sued us, claiming that the Google AdWords program infringes certain claims of an Overture Services patent. It also claims that the patent relates to Overture Services' own bid-for-ad placement business model and its pay-for-performance technologies. We are currently litigating this case. If Overture Services wins, it may significantly limit our ability to use the AdWords program, and we also may be required to pay damages.

Companies have also filed trademark infringement and related claims against us over the display of ads in response to user queries that include trademark terms. The outcomes of these lawsuits have differed from jurisdiction to jurisdiction. A court in France has held us liable for allowing advertisers to select certain trademarked terms as keywords. We have appealed this decision. We were also sued in Germany on a similar matter where a court held that we are not liable for the actions of our advertisers prior to notification of trademark rights. We are litigating similar issues in other cases in the U.S., France and Germany.

In order to provide users with more useful ads, we have recently revised our trademark policy in the U.S. and Canada. Under our new policy, we no longer disable ads due to selection by our advertisers of trademarks as keyword triggers for the ads. As a result of this change in policy, we may be subject to more trademark infringement lawsuits. Defending these lawsuits could take time and resources. Adverse results in these lawsuits may result in, or even compel, a change in this practice which could result in a loss of revenue for us, which could harm our business.

10

Table of Contents

We have also been notified by third parties that they believe one of our products or services violates their copyrights. Generally speaking, any time that we have a product or service that links to or hosts material in which others allege to own copyrights, we face the risk of being sued for copyright infringement or related claims. Because these products and services comprise the majority of our products and services, the risk of potential harm from such lawsuits is substantial.

*Expansion into international markets is important to our long-term success, and our inexperience in the operation of our business outside the U.S. increases the risk that our international expansion efforts will not be successful.*

We opened our first office outside the U.S. in 2001 and have only limited experience with operations outside the U.S. Expansion into international markets requires management attention and resources. In addition, we face the following additional risks associated with our expansion outside the U.S.:

- Challenges caused by distance, language and cultural differences.
- Longer payment cycles in some countries.
- Credit risk and higher levels of payment fraud.
- Legal and regulatory restrictions.
- Currency exchange rate fluctuations.
- Foreign exchange controls that might prevent us from repatriating cash earned in countries outside the U.S.
- Political and economic instability and export restrictions.
- Potentially adverse tax consequences.
- Higher costs associated with doing business internationally.

These risks could harm our international expansion efforts, which would in turn harm our business and operating results.

*We compete internationally with local information providers and with U.S. competitors who are currently more successful than we are in various markets.*

We face different market characteristics and competition outside the U.S. In certain markets, other web search, advertising services and Internet companies have greater brand recognition, more users and more search traffic than we have. Even in countries where we have a significant user following, we may not be as successful in generating advertising revenue due to slower market development, our inability to provide attractive local advertising services or other factors. In order to compete, we need to improve our brand recognition and our selling efforts internationally and build stronger relationships with advertisers. We also need to better understand our international users and their preferences. If we fail to do so, our global expansion efforts may be more costly and less profitable than we expect.

*Our business may be adversely affected by malicious third-party applications that interfere with the Google experience.*

Our business may be adversely affected by malicious applications that make changes to our users' computers and interfere with the Google experience. These applications have in the past attempted, and may in the future attempt, to change our users' Internet experience, including hijacking queries to Google.com, altering or replacing Google search results, or otherwise interfering with our ability to connect with our users. The interference often occurs without disclosure to or consent from users, resulting in a negative experience that users may associate with Google. These applications may be difficult or impossible to uninstall or disable, may

11

Table of Contents

reinstall themselves and may circumvent other applications' efforts to block or remove them. The ability to reach users and provide them with a superior experience is critical to our success. If our efforts to combat these malicious applications are unsuccessful, our reputation may be harmed, and our communications with certain users could be impaired. This could result in a decline in user traffic and associated ad revenues, which would damage our business.

*If we fail to detect click-through fraud, we could lose the confidence of our advertisers, thereby causing our business to suffer.*

We are exposed to the risk of fraudulent clicks on our ads. We have regularly paid refunds related to fraudulent clicks and expect to do so in the future. If we are unable to stop this fraudulent activity, these refunds may increase. If we find new evidence of past fraudulent clicks we may have to issue refunds retroactively of amounts previously paid to our Google Network members. This would negatively affect our profitability, and these types of fraudulent activities could hurt our brand. If fraudulent clicks are not detected, the affected advertisers may experience a reduced return on their investment in our advertising programs because the fraudulent clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which could lead to loss of advertisers and revenue.

*We are susceptible to index spammers who could harm the integrity of our web search results.*

There is an ongoing and increasing effort by "index spammers" to develop ways to manipulate our web search results. For example, because our web search technology ranks a web page's relevance based in part on the importance of the web sites that link to it, people have attempted to link a group of web sites together to manipulate web search results. We take this problem very seriously because providing relevant information to users is critical to our success. If our efforts to combat these and other types of index spamming are unsuccessful, our reputation for delivering relevant information could be diminished. This could result in a decline in user traffic, which would damage our business.

*Our ability to offer our products and services may be affected by a variety of U.S. and foreign laws.*

The laws relating to the liability of providers of online services for activities of their users are currently unsettled both within the U.S. and abroad. Claims have been threatened and filed under both U.S. and foreign law for defamation, libel, invasion of privacy and other data protection claims, tort, unlawful activity, copyright or trademark infringement, or other theories based on the nature and content of the materials searched and the ads posted or the content generated by our users. From time to time we have received notices from individuals who do not want their names or web sites to appear in our web search results when certain keywords are searched. It is also possible that we could be held liable for misinformation provided over the web when that information appears in our web search results. If one of these complaints results in liability to us, it could be potentially costly, encourage similar lawsuits, distract management and harm our reputation and possibly our business. In addition, increased attention focused on these issues and legislative proposals could harm our reputation or otherwise affect the growth of our business.

The application to us of existing laws regulating or requiring licenses for certain businesses of our advertisers, including, for example, distribution of pharmaceuticals, adult content, financial services, alcohol or firearms, can be unclear. Existing or new legislation could expose us to substantial liability, restrict our ability to deliver services to our users, limit our ability to grow and cause us to incur significant expenses in order to comply with such laws and regulations.

Several other federal laws could have an impact on our business. Compliance with these laws and regulations is complex and may impose significant additional costs on us. For example, the Digital Millennium Copyright Act has provisions that limit, but do not eliminate, our liability for listing or linking to third-party web sites that include materials that infringe copyrights or other rights, so long as we comply with the statutory

12

Table of Contents

requirements of this act. The Children's Online Protection Act and the Children's Online Privacy Protection Act restrict the distribution of materials considered harmful to children and impose additional restrictions on the ability of online services to collect information from minors. In addition, the Protection of Children from Sexual Predators Act of 1998 requires online service providers to report evidence of violations of federal child pornography laws under certain circumstances. Any failure on our part to comply with these regulations may subject us to additional liabilities.

We also face risks associated with international data protection. The interpretation and application of data protection laws in Europe and elsewhere are still uncertain and in flux. It is possible that these laws may be interpreted and applied in a manner that is inconsistent with our data practices. If so, in addition to the possibility of fines, this could result in an order requiring that we change our data practices, which in turn could have a material effect on our business.

*If we were to lose the services of Eric, Larry, Sergey or our senior management team, we may not be able to execute our business strategy.*

Our future success depends in a large part upon the continued service of key members of our senior management team. In particular, our CEO Eric Schmidt and our founders Larry Page and Sergey Brin are critical to the overall management of Google as well as the development of our technology, our culture and our strategic direction. All of our executive officers and key employees are at-will employees, and we do not maintain any key-person life insurance policies. The loss of any of our management or key personnel could seriously harm our business.

*The initial option grants to many of our senior management and key employees are fully vested. Therefore, these employees may not have sufficient financial incentive to stay with us.*

Many of our senior management personnel and other key employees have become, or will soon become, substantially vested in their initial stock option grants. While we often grant additional stock options to management personnel and other key employees after their hire dates to provide additional incentives to remain employed by us, their initial grants are usually much larger than follow-on grants. Employees may be more likely to leave us after their initial option grant fully vests, especially if the shares underlying the options have significantly appreciated in value relative to the option exercise price. We have not given any additional grants to Eric, Larry or Sergey. Larry and Sergey are fully vested, and only a small portion of Eric's stock is subject to future vesting.

*If we are unable to retain or motivate key personnel or hire qualified personnel, we may not be able to grow effectively.*

Our performance is largely dependent on the talents and efforts of highly skilled individuals. Our future success depends on our continuing ability to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization. Competition in our industry for qualified employees is intense, and we are aware that certain of our competitors have directly targeted our employees. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees.

We have in the past maintained a rigorous, highly selective and time-consuming hiring process. We believe that our approach to hiring has significantly contributed to our success to date. As we grow, our hiring process may prevent us from hiring the personnel we need in a timely manner. In addition, as we become a more mature company, we may find our recruiting efforts more challenging. The incentives to attract, retain and motivate employees provided by our option grants or by future arrangements, such as through cash bonuses, may not be as effective as in the past. If we do not succeed in attracting excellent personnel or retaining or motivating existing personnel, we may be unable to grow effectively.

13

Table of Contents

*Our CEO and our two founders run the business and affairs of the company collectively, which may harm their ability to manage effectively.*

Eric, our CEO, and Larry and Sergey, our founders and presidents, currently provide leadership to the company as a team. Our bylaws provide that our CEO and our presidents will together have general supervision, direction and control of the company, subject to the control of our board of directors. As a result, Eric, Larry and Sergey tend to operate the company collectively and to consult extensively with each other before significant decisions are made. This may slow the decision-making process, and a disagreement among these individuals could prevent key strategic decisions from being made in a timely manner. In the event our CEO and our two founders are unable to continue to work well together in providing cohesive leadership, our business could be harmed.

*We have a short operating history and a relatively new business model in an emerging and rapidly evolving market. This makes it difficult to evaluate our future prospects and may increase the risk of your investment.*

We first derived revenue from our online search business in 1999 and from our advertising services in 2000, and we have only a short operating history with our cost-per-click advertising model, which we launched in 2002. As a result, we have very little operating history for you to evaluate in assessing our future prospects. Also, we derive nearly all of our net revenues from online advertising, which is an immature industry that has undergone rapid and dramatic changes in its short history. You must consider our business and prospects in light of the risks and difficulties we will encounter as an early-stage company in a new and rapidly evolving market. We may not be able to successfully address these risks and difficulties, which could materially harm our business and operating results.

*We may have difficulty scaling and adapting our existing architecture to accommodate increased traffic and technology advances or changing business requirements.*

To be successful, our network infrastructure has to perform well and be reliable. The greater the user traffic and the greater the complexity of our products and services, the more computing power we will need. In 2004, we expect to spend substantial amounts to purchase or lease data centers and equipment and to upgrade our technology and network infrastructure to handle increased traffic on our web sites and to roll out new products and services. This expansion is going to be expensive and complex and could result in inefficiencies or operational failures. The costs associated with these adjustments to our architecture could harm our operating results. Cost increases, loss of traffic or failure to accommodate new technologies or changing business requirements could harm our operating results and financial condition.

*Problems with bandwidth providers, data centers or other third parties could harm us.*

We rely on third-party vendors, including data center and bandwidth providers. Any disruption in the network access or co-location services provided by these third-party providers or any failure of these third-party providers to handle current or higher volumes of use could significantly harm our business. Any financial or other difficulties our providers face may have negative effects on our business, the nature and extent of which we cannot predict. We exercise little control over these third party vendors, which increases our vulnerability to problems with the services they provide. We license technology and related databases from third parties to facilitate aspects of our data center and connectivity operations including, among others, Internet traffic management services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. Any errors, failures, interruptions or delays experienced in connection with these third-party technologies and information services could negatively impact our relationship with users and adversely affect our brand and our business and could expose us to liabilities to third parties.

Our systems are also heavily reliant on the availability of electricity, which also comes from third-party providers. If we were to experience a major power outage, we would have to rely on back-up generators. These

[Pages Intentionally Omitted]