IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Rosetta Stone Ltd.,               )
                                  )
        Plaintiff,                )
                                  )
        v.                        )   Case No. 1:09cv736 (GBL/TCB)
                                  )
Google Inc.,                      )
                                  )
        Defendant.                )

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff's Motion for
Partial Summary Judgment as to Liability (Dkt. No. 103) and
Defendant's Motion for Summary Judgment (Dkt. No. 112). This
case concerns Plaintiff Rosetta Stone Ltd.'s ("Rosetta Stone")
allegations that Defendant Google Inc. ("Google") is actively
assisting third party advertisers to mislead consumers and
misappropriate Rosetta Stone's trademarks by using the
trademarks (1) as keyword triggers for paid advertisements and
(2) within the title and text of paid advertisements on Google's
website. There are five issues before the Court. The first
issue is whether Google's practice of auctioning Rosetta Stone's
trademarks to third party advertisers for use in their Sponsored
Link titles and advertisement text creates a likelihood of
confusion to warrant granting summary judgment in favor of
Rosetta Stone as to Counts I (trademark/service mark

infringement under the Lanham Act), V (trademark infringement under Virginia Law), and VI (unfair competition under Virginia law). Notwithstanding a finding of likelihood of confusion, the second issue is whether Google's use of Rosetta Stone's trademarks as keyword triggers under its advertising program is functional and, therefore, a non-infringing use. The third issue is whether Google intentionally induces third party advertisers to bid on Rosetta Stone's trademarks or knowingly continues to permit advertisers selling counterfeit Rosetta Stone products to use the trademarks in their Sponsored Link titles and advertisement text, despite Rosetta Stone's reports of infringement, to warrant granting summary judgment in favor of Rosetta Stone as to Count II (contributory trademark/service mark infringement under the Lanham Act). The fourth issue is whether Google exercises joint ownership and control over third party advertisers' Sponsored Link titles and advertisement text on its website to warrant granting summary judgment in favor of Rosetta Stone as to Count III (vicarious trademark/service mark infringement under the Lanham Act). The final issue is whether Rosetta Stone sufficiently demonstrates economic loss resulting from a decline in its brand name, which is attributable to Google's practice of auctioning Rosetta Stone's trademarks for profit to third party advertisers, to warrant granting summary judgment in favor of Rosetta Stone as to Count IV

(trademark/service mark dilution under the Lanham Act).

The Court grants summary judgment in favor of Google on Counts I, V and VI because no reasonable trier of fact could find that Google's practice of auctioning Rosetta Stone's trademarks as keyword triggers to third party advertisers for use in their Sponsored Link titles and text creates a likelihood of confusion as to the source or origin of Rosetta Stone's goods. Furthermore, because Google uses Rosetta Stone's trademark to identify relevant information to users searching on those trademarks, the use is a functional and non-infringing one. The Court grants summary judgment in favor of Google on Count II because no reasonable trier of fact could find that Google intentionally induces or knowingly continues to permit advertisers selling counterfeit Rosetta Stone products to use the trademarks in their Sponsored Link titles and advertisement text. The Court also grants summary judgment in favor of Google on Count III because no reasonable trier of fact could find that Google exercises joint ownership and control over third party advertisers' Sponsored Links titles and text. Neither Google's employees nor its Query Suggestion Tool directs or influences third party advertisers to bid on Rosetta Stone's trademarks when they subscribe to Google's advertising program. Finally, the Court grants summary judgment in favor of Google on Count IV because there is no genuine dispute of material fact that

Rosetta Stone's brand awareness has only increased since Google
changed its trademark policy to permit the use of trademarked
terms as keyword triggers and as words within Sponsored Link
titles and advertisement text.

## I.   BACKGROUND

### A.   Plaintiff Rosetta Stone Ltd. and the Rosetta Stone Marks

Rosetta Stone is a Virginia-based corporation founded in
1992 that provides technology-based language learning products
and services.  (Pl.'s Mem. Supp. Partial Summ. J. 1-2.)  As the
foremost language education company in the United States,
Rosetta Stone's language learning products are available in over
thirty languages and are used by schools, corporations,
government entities and millions of individuals in over 150
countries.  (Adams Decl. ¶¶ 10-11.)  To preserve its trademark
rights, Rosetta Stone obtained federal trademark registration
for some of its marks, including: ROSETTA STONE, ROSETTA STONE
LANGUAGE LEARNING SUCCESS, ROSETTASTONE.COM, and ROSETTA WORLD
(the "Rosetta Stone Marks").  (Eichmann Decl. ¶ 2; May Decl. ¶¶
2-7, Exs. 1-6.)  These Marks have become distinctive and
uniquely associated with Rosetta Stone.  (Pl.'s Mem. Supp. Summ.
J. 3-4.)

In order to build the fame, reputation, and goodwill of its
Marks, Rosetta Stone advertises through a variety of media,

including television, radio, newspapers, magazines, direct mail,
and telephone directories. (Eichmann Decl. ¶¶ 3-6, Exs. 1-3.)
It conducts a substantial amount of its business over the
Internet using many web-based services, including those offered
by Google, and makes a sizeable investment in the development of
its online business. (Eichmann Decl. ¶ 6, Exs. 1-3.) Along
with promoting its products and services via its own website
(www.rosettastone.com), Rosetta Stone advertises on the websites
of third parties. It authorizes resellers such as Amazon.com,
Barnes & Noble, and Borders, to sell authentic Rosetta Stone
products. (Caruso Decl. Ex. 72 at 147:9-148:18, Ex. 58 at
96:12-98:10.) Specifically, it entered into agreements with
Amazon.com and eBay that allow them to use the Rosetta Stone
Marks in connection with advertising. (Caruso Decl. Exs. 40-
44.)

B. Defendant Google Inc. and Google's Search Engine

        Located in Mountain View, California, Google is an Internet
company that owns and operates one of the world's most utilized
internet search engines, www.google.com. (Spaziano Decl. Ex. 1
(Ans. ¶ 3).) The Internet is a global network of millions of
interconnected computers and the World Wide Web is an
application running on the Internet that allows for the display
of text, images, and sound. (First Am. Compl. ¶ 13.) Much of

the information on the World Wide Web is stored in the form of
web pages that can be assessed through a computer connected to
the Internet (available through commercial Internet service
providers or "ISPs") and viewed using a computer program called
a "browser," such as Microsoft Internet Explorer.  A web page is
identified by its own unique Uniform Resource Locator ("URL") or
"web address" (e.g., http://www.rosettastone.com), which
ordinarily includes the website's "domain name" (e.g.,
www.rosettastone.com).  (First Am. Compl. ¶ 13.)

    Web users searching for a specific company product, service
or piece of information, but who do not know the exact domain
name or website address where it may be found, may use Google's
search engine to locate it.  (First Am. Compl. ¶ 25.)  A search
engine is a computer program that allows web users to search the
World Wide Web for websites containing particular content.
(First Am. Compl. ¶ 3.)  A search engine checks the terms
entered into it against its databases and applies a formula or
algorithm to produce a search results page that lists the
websites that may relate to the user's search terms and their
corresponding links.  (First Am. Compl. ¶ 25.)  To use Google's
search engine, a web user need only type in a few words and hit
the "enter" key (or click the "Google Search" button) to receive
a list of hyperlinks ("links") to web pages that Google
identifies as relevant to the search requested.  (First Am.

6

Compl. ¶ 4.)  The search results generated by Google's search engine are determined by a "natural" or "organic" system that lists results in order of objective relevance to the search terms input into the search engine, with the most relevant websites appearing near the top of the web page.  (First Am. Compl. ¶ 26.)

Google's search engine is available not only on its own website but also through other popular websites such as America Online, Netscape, EarthLink, CompuServe, Shopping.com, AT&T WorldNet, and Ask.com.  (First Am. Compl. ¶ 34.)  In addition, Google invites consumers to affix a "Google Toolbar" at the top of their Internet browsers that allows these users to conduct Google searches even when they are not currently visiting www.google.com.  (First Am. Compl. ¶ 34.)  As such, Google's content network reaches 80% of global internet users, and over 70% of U.S. Internet searches use Google's search engine.  (First Am. Compl. ¶ 35.)

When a web user hits the "enter" key, Google not only provides web users with organic search results, it also displays paid advertisements above or alongside the organic search results.  (Caruso Decl. Ex. 59 at 202:1-9 & 205:20-206:25, Ex. 76 at 175:22-177:16, Ex. 64 at 112:16-113:1.)  These paid advertisements consist of a combination of content and a link to the advertiser's website such that if a user clicks on the link,

she will open the advertiser's website, which offers additional
information about the advertiser and may provide the user with
an option to purchase the advertiser's goods and services.  To
offer such content-based links, Google relies on at least one of
its advertising programs called the AdWords Select Advertising
Program ("AdWords Program").  (First Am. Compl. ¶ 36.)

## C.  Google's AdWords Program

Google's AdWords Program" is an auction-style advertising
program that displays advertisements to users of Google's search
engine in the form of Sponsored Links.  (Spaziano Decl. Ex. 1
(Ans. ¶¶ 5 & 36).)  The Sponsored Links are displayed above or
to the right of the organic search results.   (Spaziano Decl.
Ex. 1 (Ans. ¶ 28).)  Those above the organic search results
share a yellow rectangular background while those to the right
of the organic search results are separated by a blue line.
(Caruso Decl. Exs. 10 & 13.)  These Sponsored Links appear in a
color, typeface, and font size similar to the search results
generated from a web user's query.  (Caruso Decl. Exs. 10 & 13;
First Am. Compl. ¶ 38.)

Under the AdWords Program, Google offers an advertiser the
ability to select certain words or phrases ("keywords") that,
combined with the advertisement's quality and the maximum bid
price for the advertisement, will trigger a Sponsored Link to

the advertiser's chosen website.  (Caruso Decl. Ex. 52 at 18:17-20:19, 65:13-66:8, & 100:16-101:1.)  Advertisers select the keywords from a list of words or phrases generated algorithmically using Google's keyword tools, of which there are three: (1) Keyword Tool; (2) Query Suggestion Tool; and (3) a trademark-specific version of the Query Suggestion Tool. (Caruso Decl. Ex. 54 at 13:18-14:4, 18:11-17, & 21:25-22:11.) Before the list is displayed to advertisers, however, it is passed through a filter which removes terms that Google entered into the filter as trademarked terms for which Google has received a complaint.  (Caruso Decl. Ex. 54 at 19:8-24, 23:22-24:7, & 25:2-7.)  Alternatively, advertisers can also select the keywords on their own without relying on the list generated by Google's keyword tools.  (Lloyd Decl. Ex. 9 & 11.)  If the advertisement's quality and bid price are sufficiently high, it qualifies to be shown on Google.com  (Caruso Decl. Ex. 52 at 17:12-21:18, 65:13-66:8, & 100:16-101:1; Spaziano Decl. Ex. 1 (Ans. ¶¶ 29 & 39), Ex. 2 at GOOG-RS-0306288, Ex. 3 at 9.)

For example, using the AdWords Program, Company B, a company that sells children's shoes, can cause Google to display its Sponsored Link whenever a Google user conducts a search using the term, "children's shoes."  Company B can also cause its Sponsored Link to appear whenever the user searches for the term "Company A," Company B's competitor, who also sells

children's shoes.  Consequently, whenever a Google user wishing
to buy children's shoes from Company A conducts a search of the
term A (Company A's trademark), a Sponsored Link would appear on
the search results page, inviting the user to view children's
shoes from Company B, Company A's competitor.  If the user
clicked on Company B's link, Company B's website would open on
the screen and the user might be able to purchase children's
shoes from Company B.  Thus, by participating in the AdWords
Program, advertisers are able to place their advertising in
front of consumers who identify themselves as interested in
certain products or services offered by the advertisers'
companies.  (First Am. Compl. ¶ 27.)

D.  Google's Trademark Policy

     Google's policy of allowing third party advertisers to
purchase specific trademarks as keyword triggers for the
Sponsored Links began in 2004.  (Lloyd Decl. Ex. 1; First Am.
Compl. ¶ 44.)  In its Form S-1 Registration Statement to the
Securities Exchange Commission, dated April 29, 2004, Google
informed its investors of the following:

     In order to provide users with more useful ads, we
     have recently revised our trademark policy in the
     U.S. and in Canada. Under our new policy, we no
     longer disable ads due to selection by our
     advertisers of trademarks as keyword triggers for
     the ads.

(Spaziano Decl. Ex. 7).  The S-1 Form further states:

10

As a result of this change in policy, we may be
subject to more trademark infringement lawsuits
. . . . Adverse results in these lawsuits may
result in, or even compel, a change in this practice
which could result in a loss of revenue for us,
which could harm our business.
(Spaziano Decl. Ex. 7).

In 2009, Google again revised its trademark policy.  (Lloyd
Decl. Ex. 1.)  Specifically, the AdWords Program now makes two
distinct uses of a given keyword: (1) as a trigger to the
Sponsored Link advertisement and (2) as part of the
advertisement itself.  (Lloyd Decl. Ex. 1-2.)  The new policy
allows, in addition to the brand owner and its authorized
licensees, advertisers to include the trademark in the
advertisement's text if they (1) resell legitimate products
bearing the trademark; (2) sell components, replacement parts,
or compatible products corresponding to the trademark; or (3)
provide non-competitive information about the goods or services
corresponding to the trademark term.  (Lloyd Decl. Exs. 2, 4;
Caruso Decl. Ex. 55 at 154:6-15.)

To enforce its trademark policy, Google employs a trademark
team, known as the Trust and Safety Team, which responds to
complaints about advertisements that violate certain conditions
of its AdWords Program.  (Caruso Decl. Ex. 67 at 7:24-8:19;
Lloyd Decl. ¶¶ 9-11.)  As a general practice, the Trust and
Safety Team works to address problems with fraud and

11

counterfeiting.   (Caruso Decl. Ex. 68 at 50:4-51:10, Ex. 53 at
34:21-37:11, Ex. 67 at 108:2-109:16; Louie Decl. ¶¶ 1-5.)
The Team responds to notices of counterfeit advertisements on
Google's website and takes down any advertisements confirmed to
violate its AdWords Program.   (Caruso Decl. Exs. 21, 23-25, 28,
Ex. 65 at 135:11-138:25.)   For example, when Rosetta Stone's
Enforcement Manager, Jason Calhoun, informs Google that a
particular advertiser is selling counterfeit Rosetta Stone
products, Google responds by taking action, including removing
the advertisement.   (Caruso Decl. Exs. 21, 23-25, 28, Ex. 65 at
135:11-138:25; Calhoun Decl. Exs. B-C.)   But despite its
efforts, some advertisers have used loopholes in Google's
programming to create Sponsored Links that deceive and misdirect
Google's users to websites that sell counterfeit Rosetta Stone
products or suggest to consumers a connection to Rosetta Stone
that does not exist.   (First Am. Compl. ¶ 58.)

E.   Procedural History

    Based on Google's current trademark policy, Rosetta Stone
brings this action alleging that Google, through its AdWords
Program, is helping third parties to mislead consumers and
misappropriate the Rosetta Stone Marks by using them as keyword
triggers for Sponsored Links and using them within the text or
title of the Sponsored Links.   (First Am. Compl. ¶¶ 70-124.)

Rosetta Stone alleges that by giving third party advertisers under the AdWords Program the right to use the Rosetta Stone Marks or words, phrases, or terms similar to those Marks as keyword triggers that cause Sponsored Links to be displayed, Google is helping these advertisers misdirect web users to websites of companies that (i) compete with Rosetta Stone, (ii) sell language education programs from Rosetta Stone's competitors, (iii) sell counterfeit Rosetta Stone products, or (iv) are entirely unrelated to language education.   (First Am. Comp. ¶ 5.)   According to Rosetta Stone, Google's conduct amounts to trademark infringement and is driven by an economic incentive to increase the number of Sponsored Links that appear for every term entered into its search engine because Google is paid by its AdWords advertisers on a "cost-per-click" basis. (Spaziano Decl. Ex. 1 (Ans. ¶¶ 37 & 63).)

In its First Amended Complaint, Rosetta Stone alleges seven Counts for relief: I (trademark/service mark infringement under the Lanham Act); II (contributory trademark/service mark infringement under the Lanham Act); III (vicarious trademark/service mark infringement under the Lanham Act); IV (trademark/service mark dilution under the Lanham Act); V (trademark infringement under Virginia Law); VI (unfair competition under Virginia law); and VII (unjust enrichment under Virginia Law).   The parties now move for summary judgment

13

on all counts. Because Google filed a Motion to Dismiss Count VII of Rosetta Stone's Amended Complaint[1] (Dkt. No. 94.) before filings its Motion for Summary Judgment, this Memorandum Opinion addresses only Counts I-VI.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis added).

A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports*

---

[1] The Court addresses Google's Motion to Dismiss Count VII in a separate Memorandum Order.

*Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248. Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. ANALYSIS

### A. Direct Trademark Infringement Under the Lanham Act[2]

The first and most contentious issue between the parties is whether Google is liable for direct trademark infringement based on its practice of auctioning the Rosetta Stone Marks to third party advertisers for use in their Sponsored Link titles and

---

[2] The Court addresses Counts I, V and VI together because the test for trademark infringement under the Lanham Act is essentially the same as that for common law trademark infringement and unfair competition under Virginia law.

15

advertisement text.  On this issue, the Court grants summary

judgment in favor of Google because no reasonable trier of fact

could find that Google's practice of auctioning Rosetta Stone's

trademarks as keyword triggers to third party advertisers

creates a likelihood of confusion as to the source or origin of

Rosetta Stone's products.  Section 32(1) of the Lanham Act

provides, in pertinent part:

> Any person who shall, without the consent of the
> registrant – (a) use in commerce any reproduction,
> counterfeit, copy, or colorable imitation of a
> registered mark in connection with the . . .
> advertising of any goods or services on or in
> connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy or colorably
> imitate a registered mark and apply such . . .
> to be used in commerce upon or in connection with
> the . . . advertising of goods or services on or in
> connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive, shall
> be liable in a civil action by the registrant . . . .

15 U.S.C. § 1114(1) (2005).  A cause of action for trademark

infringement under the Lanham Act requires the plaintiff to

prove that (1) it possesses a mark; (2) defendant used the mark;

(3) defendant's use of the mark occurred in commerce; (4)

defendant used the mark in connection with the sale, offering

for sale, distribution, or advertising of goods or services; and

(5) defendant used the mark in a manner likely to confuse

consumers as to the source or origin of goods or services.

*People for the Ethical Treatment of Animals v. Doughney*, 263

16

F.3d 359, 364 (4th Cir. 2001).   Whether consumer confusion is
likely depends on the following nine factors:  (1) strength or
distinctiveness of the mark; (2) similarity of the two marks to
consumers; (3) similarity of the goods and services the marks
identify; (4) similarity between the facilities used by the
markholders; (5) similarity of advertising used by the
markholders; (6) defendant's intent; (7) actual confusion; (8)
quality of the defendant's product; (9) sophistication of the
consuming public.  *George & Co., L.L.C. v. Imagination Entm't
Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009).   Not all factors,
however, are relevant or weighed equally.   *Id.* (*citing Anheuser-
Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.
1992)).

Here, the parties do not dispute the first four trademark
infringement elements.  (Pl.'s Mem. Supp. Partial Summ. J. 15-
20; Def.'s Mem. Supp. Summ. J. 8-23.)   The inquiry, therefore,
is whether Google's practice of auctioning the Rosetta Stone
Marks as keyword triggers for Sponsored Links and allowing their
use within the Sponsored Links' text or title is likely to
create confusion among consumers as to the source or origin of
Rosetta Stone's goods or services.  Specifically, only three of
the nine confusion factors are in dispute:  (1) defendant's
intent; (2) actual confusion; and (3) the consuming public's
sophistication.  (Pl.'s Mem. Supp. Partial Summ. J. 17-26;

17

Def.'s Mem. Supp. Summ. J. 15-20.)   The Court addresses these
factors in turn.

1.   *Intent*

No genuine dispute of material fact exists which would
cause a reasonable juror to find that Google intended to confuse
potential purchasers of Rosetta Stone's products by auctioning
the Rosetta Stone Marks as keyword triggers or allowing their
use within the Sponsored Link titles and text.   Moreover, there
is no evidence that Google is attempting to pass off its goods
or services as Rosetta Stone's.   "[T]he relevant intent in
trademark cases is not merely an intent to profit . . . but an
'intent to confuse the buying public.' "   *Anheuser-Busch, Inc.*
*v.   L & L Wings, Inc.*, 962 F.2d 316, 321 (4th Cir. 1992)
(quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th
Cir. 1984)).   Intent is generally shown by the defendant's
efforts to create knock-offs and pass them off as those of
other's.   *See Pizzeria Uno*, 747 F.2d at 1535 ("[O]ne intending
to profit from another's reputation generally attempts to make
his signs, advertisements, etc., to resemble the other's so as
deliberately to induce confusion."); *Best & Co. v. Miller*, 167
F.2d 374, 377 (2d Cir. 1948), *cert. denied,* 335 U.S. 818 (1948)
("If the defendant selects a trademark or trade name similar to
the plaintiff's with intent to palm off his wares as those of
the plaintiff, proof of his intent may be strong evidence of . .

. the likelihood of confusion.").

In simplified terms, Google's popular search engine aggregates information and provides advertising space. This is akin to a newspaper or magazine selling advertising space. To attract advertisers, Google created a system for displaying advertisements that would be economically profitable for its company and paid advertisers. It does not, however, sell Google-made products on its website. Web users do not visit Google's website to buy Google products because Google does not sell products. Any argument that Google is trying to palm off its goods as those of Rosetta Stone's is, therefore, unfounded.

To prove that Google unlawfully intended to trade on the Rosetta Stone Marks, Rosetta Stone points to Google's knowledge that use of trademarked keywords in the text of Sponsored Links can generate more revenue. (Spaziano Decl. Ex. 18 at GOOG-RS-0309882 & Ex. 19; Pl.'s Mem. Supp. Summ. J. 23.) Rosetta Stone insists Google revised its trademark policy in 2009 knowing that the change would result in higher click-through rates. (Spaziano Decl. Ex. 17.) However, as the Fourth Circuit reasoned in *Anheuser-Busch*, evidence of financial gain alone is insufficient evidence of intent. 962 F.2d at 322. There, the court reversed the district court's grant of plaintiff beer manufacturer's motion for judgment notwithstanding the verdict that defendant T-shirt distributor committed trademark

19

infringement. *Id.* While recognizing that the defendant's primary motive in creating the T-shirt design was to make a profit, the court explained that an intent to profit is not the same thing as an intent to confuse. *Id.* ("We cannot assume that the commercial success of the . . . T-shirt resulted from consumer confusion; consumers may have been moved to buy the T-shirt by the simple fact that they were amused by the cleverness of its design.) Likewise, evidence that Google stands to make more money under its current trademark policy, absent more, cannot meet Rosetta Stone's burden of proving that Google used the Rosetta Stone Marks with intent to confuse the buying public.

An alleged infringer may intend to benefit from the trademark without ever intending to cause consumer confusion. *Id.* Google's intent to increase its earnings does not necessarily demonstrate an intent to mislead or confuse potential buyers of Rosetta Stone's products. In fact, it is in Google's own business interest, as a search engine, not to confuse its users by preventing counterfeiters from taking advantage of its service. Google's success depends on its users finding relevant responses to their inquiries. (Caruso Decl. Ex. 76 at 175:22-177:16; Def.'s Mem. Opp'n Summ. J. 19.) It does not make money from advertisements of counterfeit Rosetta Stone products because counterfeiters generally use stolen

20

credit cards to secure the advertising, and battling such counterfeiters is a drain on Google's resources. (Lloyd Decl. ¶ 9; Louie Decl. ¶¶ 3-6.) Even if it is true that Google stands to profit financially from higher click-through rates, its long term financial loss would far exceed its immediate gains if it provided search services without regard to possible counterfeiting operations. If Google intentionally confuses its users and deprives them of a positive experience, traffic at its website will decrease, causing it to lose revenue.

Moreover, Google argues it revised its trademark policy, in part, because it developed a technological tool by which the websites linking to advertisements on www.google.com could be automatically checked to assess the website's status as a reseller or informational site before an advertisement containing a monitored trademark term would be displayed (Caruso Decl. Ex. 62 at 80:18-81:5 & 88:16-90:22; Lloyd Decl. Ex. 5). This technological feasibility minimized the work of Google's advertising and support team, thereby leaving more time for them to focus on securing additional advertisements. Consequently, it cannot be shown that Google's intent in providing third party advertisers with the opportunity to bid on the Rosetta Stone Marks as keyword triggers violates the Lanham Act or related statutes.

2.  *Actual Confusion*

The parties agree that consumer actual confusion as to the
source or origin of goods is the most important factor and the
best evidence of likelihood of confusion. (Pl.'s Mem. Supp.
Summ. J. 20; Def.'s Mem. Opp'n Summ. J. 18.)  In this vein,
Rosetta Stone relies on two cases for its position that Google's
trademark policy generally results in a likelihood of confusion.
(Pl.'s Mem. Supp. Summ. J. 20-21; Pl.'s Reply Mem. Supp. Summ.
J. 10.)  In *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455,
459 (4th Cir. 1996), a manufacturer of hosiery bearing the
"L'eggs" trademark brought suit against a competitor which
marketed a "Leg Looks" brand of hosiery.  The plaintiff
presented six instances of actual confusion by women who bought
Leg Looks® under the impression that it was a Leggs® product.
*Id.* at 466.  The record included consumer market surveys
indicating that about 30-40% of consumers throughout the nation
were confused as to the source of the product, by the similarity
of the L'eggs® and Leg Looks® marks.  *Id.* at 467.  In finding
infringement, the court determined the confusion element based
on the surveys which showed a 30-40% consumer confusion
frequency.  *Id.*

Decided well before Google went public in 1998 and before
Google's search engine gained widespread popularity, *Sara Lee* is
important for the legal consequence following a detailed set of

facts which is vastly different from what the Court is faced with in this case.  At first blush, *Sara Lee* is distinguishable in at least two ways.  First, Rosetta Stone and Google are not direct competitors in the language-learning software market. Second, the record here is devoid of consumer confusion evidence amounting to 30-40%.  Rather, Rosetta Stone's evidence of actual confusion—testimonies of five individuals out of more than 100,000 impressions over six years—is *de minimis*.  *See George & Co. L.L.C.  v. Imagination Entm't*, 575 F.3d at 398 (affirming summary judgment of no infringement where plaintiff came forward with only four instances of confusion among 500,000).  Since Google revised its trademark policy in 2004, more than 100,000,000 advertisement impressions have been triggered on Google's search results page through the keyword use of the Rosetta Stone Marks.  (Def.'s Mot. Supp. Summ. J. 7.)  Rosetta Stone only points to Google's own internal studies and the testimonies of five individuals who claim to be confused by a Sponsored Link displayed on a Google search results page when they each conducted a search for the term "Rosetta Stone." However, Rosetta Stone's evidence of statements made by Google employees about Google's 2004 trademark policy and internal experiments concerned consumer impressions of advertisements that made use of third party trademarks which did not include a Rosetta Stone Mark.  (Spaziano Decl. Ex. 8-12 & 16; Spaziano

Decl. Tab A at Hagan Dep. 93:18-94:5, Sept. 30, 2004.)  None of
the five individuals who claim to be confused referenced an
advertisement that conformed to Google's policies—i.e., used the
Rosetta Stone Marks in connection with advertising genuine
goods.  (Caruso Decl. Ex. 56 at 13:4-16:15, Ex. 57 at 13:9-24:6,
Ex. 71 at 13:3-18:14, Ex. 74 at 11:4-22 & 71:22-73:21; Spaziano
Decl. Exs. 8-12 & 16; Spaziano Decl. Tab A at Hagan Dep. 93:18-
94:5, Sept. 30, 2004, Jeffries Dep. 75:5-79:21, Porter Dep.
49:16-55:3, Thomas Dep. 70:8-73:21; Pl.'s Mem. Supp. Summ. J.
20-21.)

        *X-IT Products, L.L.C. v. Walter Kidde Portable Equipment,
Inc.*, 155 F. Supp. 2d 577 (E.D. Va. 2001) is equally
distinguishable.  There, the plaintiff filed an eight-count
complaint against the defendant for allegedly infringing on the
plaintiff's packaging, sell-sheets, and Power-Point presentation
of its residential escape ladder.  *Id.* at 597.  Denying summary
judgment for both parties on the Lanham Act claim, the court
looked to two actual instances of confusion and a survey
conducted by the plaintiff's marketing expert showing a 40%
confusion rate.  *Id.* at 624.  The court noted a complete absence
in the defendant's record of any direct rebuttal evidence.  *Id.*
Unlike the *X-IT* defendant, Google provides rebuttal evidence in
the form of declarations of various employees familiar with
Google's search engine and advertising programs.  (Caruso Decl.;

Lloyd Decl.; Louie Decl.)

As to the five witnesses who allegedly purchased
counterfeit Rosetta Stone products after conducting a search on
Google, rebuttal evidence shows that all five testified to
knowing that they were not purchasing the products directly from
Rosetta Stone.  (Caruso Decl. Ex. 56 at 13:4-16:15, Ex. 57 at
13:9-24:6 & 101:1-8, Ex. 71 at 13:3-18:14, Ex. 74 at 11:14-22,
71:22-73:21, & 74:12-75:12; Spaziano Decl. Tab A at Doyle Dep.
11:15-14:6, 15:4-16:15, & 24:6-11, Dubow Dep. 15:2-19:20, 23:19-
24:20, 32:20-33:7, & 38:18-43:10, Jeffries Dep. 13:5-14:17,
20:2-21:2, 22:12-23:2, & 24:18-26:2, Porter Dep. 21:11-22:12,
Thomas Dep. 20:4-28:5 & 75:7-12.)  Thus, none of the Rosetta
Stone witnesses were confused about the source of their purchase
but only as to whether what they purchased was genuine or
counterfeit.  They were not confused by the Sponsored Links, but
by the confusing nature of the websites from which they
purchased.  (Caruso Decl. Ex. 56 at 13:4-17:16, Ex. 57 at 23:2-
24:20, Ex. 71 at 13:3-19:22, Ex. 74 at 71:18-73:21.)  In
particular, two of the witnesses could not discern between the
links offering genuine Rosetta Stone products and counterfeit
ones.  (Caruso Decl. Ex 57 at 117:10-21, Ex. 74 at 16:4-17:5;
Spaziano Decl. Tab A at Dubow Dep. 117:10-21, Thomas Dep. 32:9-
43:19.)  Additionally, one of the witnesses purchased the
counterfeit software through an organic search and another

25

disposed of the software, thereby preventing an investigation of its authenticity (Caruso Decl. Ex 74 at 15:2-18:3, 70:8-13, & 72:16-20; Spaziano Decl. Tab A at Dubow Dep. 79:11-81:11, Thomas Dep. 47:12-18).

Rosetta Stone's contention that it has presented anecdotal evidence of numerous examples of actual confusion is undermined by the record. Evidence of complaints to Rosetta Stone's customer care center from individuals who purchased counterfeit software between December 9, 2009 through March 8, 2010 rest on the declarations and interrogatory responses of Rosetta Stone's employees. (Calhoun Decl. ¶ 9; Spaziano Opp'n Decl. Ex. 38; Pl.'s Mem. Opp'n Summ. J. 11.) However, a review of the documents referenced in Mr. Calhoun's declaration shows that the record of complaints identify sources such as Craigslist and spam emails, not Google, as the means by which the allegedly counterfeit products were located. (Le Decl. ¶¶ 3-4.) Similarly, the testimony of Google lawyers concerning screen shots presented at their deposition is inadequate when their responses reflect a mere uncertainty about the source of a product rather than actual confusion. (Lien Decl. Ex. 25 at 189:23-190:19 & 194:1-195:15, Ex. 30 at 159:21-163:11.) Finally, Dr. Kent Van Liere's survey provides unreliable evidence of actual confusion because the result contained a measure of whether respondents thought Google "endorsed" a

Sponsored Link, a non-issue.  Dr. Van Liere's opinion relied on
responses to the question of whether a given link perceived by
respondents to offer Rosetta Stone products for sale was
"endorse[d]" by Rosetta Stone, which is not the same as
confusion as to the source or origin of the products.  (Caruso
Decl. Ex. 45-C at Questionnaire 3-4.)  Accordingly, on the point
of actual confusion, the Court necessarily finds in Google's
favor.

3.  *Consuming Public's Sophistication*

Contrary to Rosetta Stone's contention, the relevant market
here is not the public at-large, but only potential buyers of
its products, whose sophistication, therefore, is a factor in
the Court's analysis.  If the typical consumer in the relevant
market is sophisticated in the use of or possesses an expertise
regarding a particular product, his sophistication or expertise
may be pertinent in determining the likelihood of confusion.
*Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127-28 (4th
Cir. 1990) (reversing the district court's finding of summary
judgment for defendant because the court failed to consider
consumer sophistication).  Such sophistication may be shown by
evidence of expert opinions or surveys.  *Star Indus., Inc. v.
Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005).  A court may
also "reach a conclusion about consumer sophistication based

solely on the nature of the product or its price." *Id*.
("Unhurried consumers in the relaxed environment of the liquor
store, making decisions about $12 to $24 purchases, may be
expected to exhibit sufficient sophistication to distinguish
between Star's and Barcardi's products, which are differently
labeled.") (citation omitted).

    As the record reflects, Rosetta Stone's products cost
approximately $259 for a single-level package and $579 for a
three-level bundle.  (Caruso Decl. Ex. 53 at 115:20-116:5.)  Its
target market is comprised of well-educated consumers willing to
invest money and energy in the time-intensive task of learning a
language.  (Caruso Decl. Exs. 31 & 34, Ex. 69 at 86:20-88:1.)
Consequently, it cannot encompass the public at large but only
web users who would type in a search query consisting of a
Rosetta Stone Mark, and who must necessarily have unaided recall
of the Marks.  (Caruso Decl. Ex. 33; Def.'s Opp'n 20.)  These
same consumers who are willing to spend hundreds of dollars on
language-learning software would reasonably take care in making
such a decision.  Given the time commitment of learning a
language, they are more likely to spend time searching and
learning about Rosetta Stone's products.  (Lien Decl. Ex. 36 at
95:13-97:11.)  Their expertise and sophistication would tend to
demonstrate that they are able to distinguish between the
Sponsored Links and organic results displayed on Google's search

results page.   Therefore, this factor strongly favors Google.

Balancing all of the disputed likelihood of confusion factors, the Court concludes that Google's use of the Rosetta Stone Marks does not amount to direct trademark infringement under Counts I, V and VI.

## B.  Functionality Doctrine

Notwithstanding a favorable finding for Google under the relevant infringement elements, the functionality doctrine protects Google's use of the Rosetta Stone Marks as keyword triggers.   The functionality doctrine provides that a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."   *Traffix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001)(citation and internal quotation omitted) (finding that whether the product configuration is a competitive necessity is an incomplete test for functionality, as a court must also consider whether the product feature is essential to the use or purpose of the device or affects its cost or quality).   The doctrine "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."   *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995).

Although *Traffix* and *Qualitex* are cases where the
functional element of the mark holder's product was present in
both parties' products, the principal theory is the same—
allowing competitors a monopoly on functional uses would inhibit
legitimate competition.  *Id.*  Applying this principle to a
search engine, courts have recognized its role as a valuable
information provider.  *See Playboy Enters., Inc. v. Welles,* 279
F.3d 796, 803-04 (9th Cir. 2002) ("Searchers would have a much
more difficult time locating relevant websites if they could do
so only by correctly guessing the long phrases necessary to
substitute for trademarks."); *see also Designer Skin, L.L.C. v.
S & L Vitamins, Inc.,* 560 F. Supp. 2d 811, 819 n. 7 (D. Ariz.
2008) (citation omitted) ("[I]t would seem more remarkable
still, and a pity, if the law, in its over-exuberant giddiness
as it thrashes about with mark-type conflicts in cyberspace,
should kill [readily available Internet directories and search
engines].")

Here, Google uses trademarked keywords, including the
Rosetta Stone Marks, to identify relevant Sponsored Links.  This
use is no different than the use of a Google search query to
trigger organic search results relevant to the user's search.
In both cases, a search term like "Rosetta Stone" will return a
string of Sponsored Links and organic links on Google's search
results page.  The keywords, therefore, have an essential

indexing function because they enable Google to readily identify in its databases relevant information in response to a web user's query. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1531 (9th Cir. 1992) (finding that use of the plaintiff's trademark initialization sequence to achieve compatibility was functional because interoperability could not be achieved without the trademark sequence); *see also Compaq Computer Corp. v. Procom Tech., Inc.*, 908 F. Supp. 1409, 1423 (S.D. Tex. 1995)(finding that the word "Compaq" inserted in computer code for purposes of compatibility was functional). This is especially important as advertisers rely on the keywords to place their products and services before interested consumers. Moreover, the keywords affect the cost and quality of Google's AdWords Program because absent third party advertisers' ability to bid on trademarked terms as keyword triggers, Google would be required to create an alternative system for displaying paid advertisements on its website—a system which is potentially more costly and less effective in generating relevant advertisements. In terms of encouraging competition, the keywords also serve an advertising function that benefits consumers who expend the time and energy to locate particular information, goods, or services, and to compare prices. Google's search engine provides consumers with a highly useful means of searching the internet for products and competitive prices. If Google is deprived of

this use of the Rosetta Stone Marks, consumers would lose the
ability to rapidly locate potentially relevant websites that
promote genuine Rosetta Stone products at competitive prices.
Consequently, because the Court is persuaded that Google's
particular use of trademarked keywords as triggers for paid
advertisements is functional, and no prohibition exists
otherwise, the Court holds that the functionality doctrine
prevents a finding of infringement.

## C.  Contributory Trademark Infringement Under the Lanham Act

On the issue of contributory trademark infringement, the
Court finds that no reasonable trier of fact could find that
Google intentionally induces or knowingly continues to permit
third party advertisers selling counterfeit Rosetta Stone
products to use the Rosetta Stone Marks in their Sponsored Link
titles and advertisement text.  To prevail on a contributory
trademark infringement claim, a plaintiff must show that the
defendant "intentionally induces another to infringe a
trademark, or [] continues to supply its product to one whom it
knows or has reason to know is engaging in trademark
infringement . . . ."  *Inwood Labs., Inc. v. Ives Labs, Inc.*,
456 U.S. 844, 854 (1982).  Although facially applicable to
manufacturers and distributors of goods, courts have applied
*Inwood's* test for contributory trademark infringement "to a

32

service provider if he or she exercises sufficient control over the infringing conduct." *Tiffany Inc. v. eBay Inc.*, 600 F.3d 93, 104 (2d Cir. 2010) (citing *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)); *see Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148-49 (7th Cir. 1992) (treating trademark infringement as a "species of tort," the court analogized a swap meet owner whose vendors sold infringing Hard Rock Cafe T-shirts to a licensor on whom the common law "imposes the same duty . . . [as *Inwood*] imposed on manufacturers and distributors"); *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996) (finding *Hard Rock Cafe's* application of the *Inwood* test for contributory trademark infringement to be "sound").

As proof of contributory infringement, Rosetta Stone points to Google's Query Suggestion Tool (the trademark-specific version launched after Google changed its trademark policy in 2009) and its purported allowance of known infringers to bid on the Rosetta Stone Marks. (Caruso Decl. Ex. 61 at 53:17-61:1; Spaziano Decl. Ex. 1 (Ans. ¶ 57), Ex. 18 at GOOG-RS-0309888-0309893, Exs. 21-23; Spaziano Decl. Tab A at Gultekin Dep. 123:8-124:4; Calhoun Decl. ¶¶ 4-6 & 8, Exs. B-D.) First, Rosetta Stone argues that the Query Suggestion Tool's function of generating suggested keywords for advertisers encourages them to bid on brand names, which directly induces advertisers to

infringe the Rosetta Stone Marks.  (Spaziano Decl. Exs. 19-20.)
Second, Rosetta Stone argues that by allowing counterfeiters to
open AdWords accounts and to bid on the Rosetta Stone Marks,
despite receiving notice of their counterfeit status, Google is
supplying a service to those it knows or has reason to know is
engaging in trademark infringement.  (Spaziano Decl. Exs. 21-23;
Calhoun Decl. ¶¶ 2, 4-5, 8, Exs. B-D.)  According to Rosetta
Stone, Google's knowledge of the ongoing infringement is evident
from its Form S-1 Registration Statement to the Securities
Exchange Commission, which predicted that Google "may be subject
to more trademark infringement lawsuits . . . ."  (Spaziano
Decl. Ex. 7.)  To illustrate, Rosetta Stone proffers evidence of
a spreadsheet that Google received which reflects the dates when
Rosetta Stone advised Google that a Sponsored Link was
fraudulent, the domain names associated with each such Sponsored
Link, the text of each Sponsored Link, and the date and
substance of Google's response.  (Caruso Decl. Ex. 28; Calhoun
Decl. ¶ 5, Ex. C.)  As documented, from September 3, 2009 through
March 1, 2010, Rosetta Stone notified Google of approximately
200 instances of Sponsored Links advertising counterfeit Rosetta
Stone products.  (Calhoun Decl. ¶ 4, Exs. C-D; Pl.'s Mem. Supp.
Summ. J. 11.)  Rosetta Stone contends that even after being
notified of these websites, Google continued to allow Sponsored
Links for other websites by these same advertisers to use the

Rosetta Stone Marks as keyword triggers and in the text of their
Sponsored Link advertisements.  For example, between October
2009 to December 2009, 110 different Sponsored Links purportedly
selling Rosetta Stone products used "Rosetta Stone" as a keyword
trigger, and most of the Links included "Rosetta Stone" or
"Rosettastone" in their display.  Registered to the same
individual, these 110 Links were displayed on 356,675 different
search-results pages.  (Calhoun Decl. Ex. D at GOOG-RS-011-
000114 to GOOG-RS-011-000187.)

     The Court, however, is unpersuaded by Rosetta Stone's
arguments.  First, the mere existence of a tool that assists
advertisers in optimizing their advertisements does not, in
itself, indicate intent to induce infringement.  Google's Query
Suggestion Tool operates by searching or indexing the particular
website identified by an advertiser and returning a limited
number of keyword ideas for websites not affiliated with the
URL.  (Spaziano Decl. Ex. 18 at GOOG-RS-0309888-0309893.) Before
the list of keyword ideas is provided to the advertisers, Google
informs them that they are responsible for the keywords selected
and for ensuring that their use of the keywords does not violate
any applicable laws.  (Caruso Decl. Ex. 54 at 19:8-16, 21:25-
22:11, & 23:22-24:18; Lien Decl. Ex. 29 at 40:25-42:11 & 58:1-
60:1, Ex. 30 at 124:10-17 & 125:11-20; Lloyd Decl. Exs. 5 & 12.)
It is no secret that Google is in the business of selling

advertising space on its website and profits from AdWords
advertisers on a "cost-per-click" basis.  Google therefore has
an economic incentive to increase the number of advertisements
and links that appear for every term entered into its search
engine.  It would be good business practice for Google to
encourage advertisers to bid on keywords that they know will
result in higher click-through rates.  This desire for economic
gain is common in all businesses.  Google is no different.  A
desire for economic gain alone does not translate into
contributory trademark infringement.

     Second, there is no evidence that Google is supplying a
service to those it knows or has reason to know is engaging in
trademark infringement.  In a recent case from the Second
Circuit involving eBay Inc., a company that operates an online
auction and shopping website, the court found that despite
eBay's promotion of certain vendors of premium branded jewelry
and its encouragement to those vendors to take advantage of the
demand for Tiffany merchandise, its relationship with third
parties' advertisements is insufficient to warrant a finding of
contributory trademark infringement.  *Tiffany Inc. v. eBay Inc.*,
600 F.3d 93, 107-09 (2d Cir. 2010).  Tiffany failed to
demonstrate that eBay was supplying services to individuals who
it knew sold counterfeit Tiffany goods.  *Id.*  eBay's generalized
knowledge of infringement of a seller's trademark on its website

was insufficient to impose upon eBay an affirmative duty to remedy the problem. *Id.* Absent evidence showing that eBay had specific contemporary knowledge of which particular listings were infringing or would infringe in the future, eBay could not be contributorily liable. *Id.*

Like Tiffany, Rosetta Stone fails to show that Google knew of the alleged infringing activity by its AdWords advertisers. There is little Google can do beyond expressly prohibiting advertisements for counterfeit goods, taking down those advertisements when it learns of their existence, and creating a team dedicated to fighting advertisements for counterfeit goods. Google has worked closely with law enforcement and brand owners to combat counterfeiting because it knows that those advertisements can create a bad experience for web users, who Google ultimately relies on for its business. (Caruso Decl. Exs. 21, 23-25, & 28, Ex. 65 at 135:11-138:25, Ex. 67 at 7:24-8:19 & 108:2-109:16, Ex. 68 at 50:4-51:10, Ex. 53 at 36:5-37:16; Lloyd Decl. ¶¶ 10-11 & Ex. 6; Louie Decl. ¶¶ 4-6; Calhoun Decl. Exs. B-D.) It would run counter to good business practice for Google to encourage and provide advertising space to those it knows are infringing on the Rosetta Stone Marks. Similar to eBay's inability to detect which vendors were genuine, Google has no mechanism for detecting which advertisers sold counterfeit Rosetta Stone products. As Rosetta Stone admits, it

cannot determine if a Rosetta Stone product is a counterfeit
without physically inspecting it. (Pl.'s Mem. Opp'n Summ. J.
4.) Even with eBay's knowledge of the high rate of Tiffany
counterfeits, the Second Circuit did not impute the degree of
specific knowledge necessary for liability. *Tiffany*, 600 F.3d
at 109. In two surveys conducted in 2004 and 2005 to assess the
extent of counterfeit merchandise being sold on eBay's site,
Tiffany found that 73.1% of the purported Tiffany goods
purchased under the 2004 survey and 75.5% of those purchased
under the 2005 survey were counterfeit.[3] *Id.* at 97. eBay also
received thousands of Notice Of Claimed Infringement Forms—
online forms that allow intellectual property right owners to
report to eBay when they have good faith belief that a listed
item infringed on a copyright or trademark. *Id.* at 106.
Comparing the evidence of knowledge attributed to eBay to the
roughly 200 notices Google received of Sponsored Links
advertising counterfeit Rosetta Stone products on its search
results pages, the Court necessarily holds that Rosetta Stone
has not met the burden of showing that summary judgment is
proper as to its contributory trademark infringement claim.

---

[3] The district court found that the surveys were methodologically flawed and
of questionable value. 600 F.3d at 97.

## D. Vicarious Trademark Infringement Under the Lanham Act

Rosetta Stone's claim for vicarious trademark infringement also fails because Google has no control over third party advertisers' Sponsored Links or their use of the Rosetta Stone Marks in the advertisement text. Absent an agency relationship, vicarious liability can only be imposed if the defendant and infringer "exercise joint ownership or control over the infringing product." *Perfect 10, Inc. v. Visa Int'l Serv. Assoc.*, 494 F.3d 788, 807 (9th Cir. 2007) (quoting *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d at 1150 (reasoning that vicarious liability is a joint-tortfeasor theory of liability)). In this case, Rosetta Stone would have to show that, aside from providing a list of keywords to its AdWords advertisers to choose from, Google has joint ownership or controls the alleged infringing advertisements appearing on its website.

Rosetta Stone's reliance on *GEICO v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) offers little assistance. There, the court addressed a motion to dismiss and ended its analysis by testing the sufficiency of GEICO's allegations that Google monitored and controlled third-party advertisements after selling to the advertisers links to trademarked terms. *Id.* at 702. While the court found that GEICO sufficiently stated a claim for vicarious infringement, it did not address the merits

of the claim.  *Id.*  Thus, contrary to Rosetta Stone, GEICO had
to satisfy a lower burden of proof.  Relying on *Perfect 10*,
Rosetta Stone also argues that Google is vicariously liable
because it has a legal right to stop the infringing conduct and
the ability to do so, but fails to act.  (Spaziano Decl. Tab A
at Hagan Dep. 27:3-18, Mar. 5, 2010, Lloyd Dep. 62:4-22, Louie
Dep. 25:01-27:17, 28:2-11, 33:19-34:19, & 37:4-8; Spaziano Decl.
Ex. 1 (Ans. ¶¶ 41, 43, & 56); Calhoun Decl. ¶¶ 6 & 8, Exs. B-D.)
This standard is inapplicable here because *Perfect 10* concerned
a plaintiff's allegations of *copyright* infringement of its
thumbnail images of nude models.  494 F.3d at 807.  Finding that
the plaintiff was unlikely to succeed on the merits of its
vicarious infringement claims against the defendant internet
retailer, the court explained that a financial relationship is
insufficient to establish joint ownership and control.  *See id.*
at 807-08.  Thus, the mere fact that Google has a financial
relationship with the alleged infringers does not demonstrate
Google's control of the Sponsored Links appearing on its
website.

Google is not engaged in the business of selling goods but
in selling space on a search page which happens to be a prime
location for advertisers wishing to display their advertisements
to online shoppers.  This is no different than building owners
in New York's Times Square who sell space for billboards.  Given

Times Square's high pedestrian and vehicular traffic, billboards

located there offer advertisers great visibility, just as

Google's popular search engine offers third party advertisers a

great opportunity to display their advertisements for goods and

services.  Aside from their location and size, advertisement by

billboards also allows creative "customizing" through extensions

and embellishments, a feature similar to a third party

advertiser's ability to create the content of their Sponsored

Link on Google's website.

Without evidence that Google's Keyword Tools or its

employees direct or influence advertisers to bid on the Rosetta

Stone Marks, Rosetta Stone has not shown that Google controls

the appearance and content of the Sponsored Links and the use of

the Rosetta Stone Marks in those Links.  Therefore, vicarious

liability cannot be imposed on Google.

## E.  Trademark Dilution Under the Lanham Act

Insofar as Google does not sell language learning software,

it cannot be held liable for trademark dilution.  Additionally,

Rosetta Stone fails to show trademark dilution where its brand

awareness has only increased and where the reputation of its

Marks has not been harmed since Google changed its trademark

policy in 2004.  Under the Trademark Dilution Revision Act

("TDRA"), which removed a plaintiff's obligation to show proof

41

of economic loss, a markholder is "entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark[.]"  15 U.S.C. § 1125(c)(1) (2006); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, L.L.C.*, 507 F.3d 252, 264 n.2 (4th Cir. 2007).  To establish trademark dilution, Rosetta Stone must prove: (1) its famous Marks are distinctive; (2) Google uses a mark in commerce that allegedly dilutes the famous Marks; (3) a similarity exists between the Rosetta Stone Marks and Google's mark giving rise to an association between the marks; and (4) the association is likely to impair the distinctiveness or reputation of the Rosetta Stone Marks.  *Louis Vuitton*, 507 F.3d at 264-65 (listing the elements of a trademark dilution claim under the TDRA).  At dispute are the first, third, and fourth elements of Rosetta Stone's claim.

     As to the first element, the Rosetta Stone Marks are famous and have been since at least 2009, when Rosetta Stone's brand awareness reached 75%.  (Caruso Decl. Ex. 69 at 111:6-12 & 112:1-7, Ex. 30-34, Ex. 60 at 131:6-132:6; Def.'s Mot. Summ. J. 6 & 26-27; Pl.'s Opp'n 24.)  The Marks need not have been famous when Google revised its trademark policy in 2004.  Instead, Rosetta Stone must only show that at any time after its Marks

became famous, Google began using a mark or trade name in commerce that was likely to cause dilution of the Rosetta Stone Marks.  § 1125(c)(1).  As to the third element, Rosetta Stone does not argue that Google uses a mark similar to the Rosetta Stone Marks on *Google's own* goods or services.  (Pl.'s Opp'n 25.)  The TDRA provides that a claim for dilution is not actionable if it involves "[a]ny fair use . . . of a famous mark by another person other than as a designation of source for the person's *own* goods or services, including use in connection with . . . advertising or promotion that permits consumers to compare goods or services[.]"  § 1125(c)(3)(A)  (emphasis added). Nonetheless, Rosetta Stone relies on cases involving defendants who used plaintiffs' marks to capitalize on the plaintiffs' fame and boost the defendants' own goods or services.  *Diane Von Furstenberg Studio v. Snyder,* No. 1:06cv1356 (JCC), 2007 WL 2688184, at *4 (E.D. Va. Sept. 10 2007) (finding no dispute that defendants used the identical DVF mark on the inferior-quality dresses they sold and that such act was likely to cause dilution of the DVF mark); *People for the Ethical Treatment of Animals, Inc. v. Doughney,* 113 F. Supp. 2d 915, 920 (E.D. Va. 2000) (finding the defendant guilty of blurring the famous PETA Mark because he used an identical mark to mentally associate PETA.ORG to that mark), *aff'd,* 263 F.3d 359, 369 (4th Cir. 2001).  Absent proof that Google uses the Rosetta Stone Marks to identify its

43

*own* goods and services, the Court finds that Google is not
liable for trademark dilution.

Even if the Court adopts the argument that liability under
§ 1125(c) may be imposed for Google's sale of the Rosetta Stone
Marks, Rosetta Stone nonetheless fails to satisfy the final
element of its trademark dilution claim—that the association
between the marks is likely to impair the distinctiveness of the
famous marks or is likely to harm the reputation of the famous
marks.  *Louis Vuitton*, 507 F.3d at 265.  If there is evidence
that the association is likely to impair the distinctiveness of
the Rosetta Stone Marks, there may be a dilution by blurring
claim.  § 1125(c); *See Louis Vuitton*, 507 F.3d at 264
("'Distinctiveness' in turn refers to the public's recognition
that the famous mark identifies a single source of the product
using the famous mark.").  If there is evidence that the
association is likely to harm the reputation of the Marks, there
may be a dilution by tarnishment claim.  § 1125(c).

Assuming the Rosetta Stone Marks were famous and
distinctive since 2004, the Court sees no evidence of dilution
by blurring when Rosetta Stone's brand awareness has only
increased since Google revised its trademark policy in 2004.
The TDRA allows courts to consider the degree of recognition of
a famous mark when determining whether that mark's
distinctiveness has been impaired.  § 1125 (c)(2)(B).  The

44

Fourth Circuit has also found that no claim for dilution by
blurring exists where a defendants' product only increases
public identification of the plaintiffs' marks. *Louis Vuitton*,
507 F.3d at 264 (finding no likelihood of dilution by blurring
where defendant's "Chewy Vuiton" dog toy parodied plaintiff's
marks and caused an increase in plaintiff's brand recognition).
Here, Rosetta Stone's brand awareness has only increased since
2004—from 15% in 2005 to 75% in 2009. (Caruso Decl. Ex. 69 at
111:6-12 & 112:1-7, Ex. 30-34, Ex. 60 at 131:6-132:6; Def.'s
Mot. Summ. J. 6 & 26-27; Pl.'s Opp'n 24.)  Its brand awareness
equity also increased from 19% in 2005 to 95% in 2009. (Caruso
Decl. Ex. 32, Ex. 69 at 120:21-122:8.)  Thus, the
distinctiveness of the Rosetta Stone Marks has not been
impaired, and Rosetta Stone cannot show that Google's trademark
policy likely caused dilution by blurring.

The Court also finds no dilution by tarnishment when there
is no evidence that those who purchased the allegedly
counterfeit software had a reduced opinion of the Rosetta Stone
Marks.  (Caruso Decl. Exs. 31-33, Ex. 60 at 131:6-132:6, Ex. 69
at 111:6-17 & 120:21-122:8; Lien Decl. Ex. 1; Spaziano Decl. Tab
A at Dubow Dep. 45:1-46:2, Jeffries Dep. 40:11-41:20, Doyle Dep.
25:10-22, Porter Dep. 41:15-42:8, Thomas Dep. 29:19-30:17.)
The five individuals who allegedly purchased counterfeit Rosetta
Stone products attested to their positive impression of the

brand. (Spaziano Decl. Tab A at Dubow Dep. 45:1-46:2, Jeffries
Dep. 40:11-41:20, Porter Dep. 41:15-42:8, Thomas Dep. 29:19-
30:17.) Thus, the reputation of the Rosetta Stone Marks has
not been impaired, and Rosetta Stone cannot show that Google's
trademark policy likely caused dilution by tarnishment. Since
Rosetta Stone has not shown that its Marks suffered a loss of
distinctiveness or reputation, which it claims resulted from
Google's policy of auctioning the Marks as keyword triggers, it
is not entitled to judgment as a matter of law.

### IV. CONCLUSION

For these reasons, the Court grants summary judgment in
favor of Google on Counts I-VI.

The Clerk is directed to forward a copy of the Memorandum
Opinion to counsel.

Entered this _3rd_ day of August 2010.

Alexandria, Virginia

_____/s/_____
Gerald Bruce Lee
United States District Judge

46